UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

GRAFTON H. HULL, JR.,

        Plaintiff on behalf of himself
        and all others similarly
        situated

        - against -

CENGAGE LEARNING HOLDINGS II, INC.,
CENGAGE LEARNING, INC.,

        Defendants.

------------------------------------ x

19-CV-19-7662

CLASS ACTION COMPLAINT

<u>JURY TRIAL DEMANDED</u>

        Plaintiff Grafton H. Hull, Jr., on his own behalf and on behalf of similarly-situated class members (the "Class Members") with respect to the class allegations, by and through his attorneys, Slarskey LLC, alleges as follows for his complaint against Cengage Learning Holding II, Inc. and Cengage Learning, Inc. (collectively "Cengage").

## **NATURE OF CASE**

        1.     Plaintiff is an author of textbooks published by Cengage, and has contracted with Cengage for Cengage to publish, sell, and distribute textbooks, pursuant to publishing agreements that provide for the payment of royalties on the sale of his works. The fundamental bargain struck between Plaintiff and his publisher was for the payment of royalties upon the *sale* of his works.

        2.     In 2014, however, Cengage came out of bankruptcy with a plan to overhaul its business model. In doing so, Cengage has trampled plaintiff's rights, and the rights of its authors. The class allegations in this lawsuit (the "Class Claims") arise out of two related practices by Cengage that are disputed by Plaintiff:

3.      *First*, plaintiff disputes Cengage's new "Cengage Unlimited" business model, pursuant to which Cengage is systematically dismantling and frustrating the business of selling author works, in favor of selling subscriptions to Cengage's catalog of titles. In transforming its business model, Cengage is wrongfully undermining its publishing agreements with plaintiff and other authors, unilaterally converting the contractual "royalty-on-sale" compensation model agreed to by plaintiff into a "relative use" compensation structure designed by Cengage, for Cengage's benefit, which plaintiff rejects. Rather than compensate plaintiff and other authors for the sale of their works, as agreed in the publishing agreements, the Cengage Unlimited model offers each end user an "all-access" pass to the Cengage catalog, and then compensates authors based on the relative use of their works by the end-users.

4.      Under this system, authors are not paid a royalty for each *sale* of their works, but rather a fractional percentage of Cengage's subscription fees, based on *the relative use* of their work. Cengage's dismantling of its "royalty-on-sale" business model frustrates Plaintiff's ability to earn royalties on the sale of his works, and constitutes a breach of the implied covenant of good faith and fair dealing implicit to the publishing agreements.

5.      *Second*, as Cengage's emphasis on digital distribution has expanded, so too has its distribution of digital "courseware," integrated digital offerings, derived from an author's work, that include such add-ons as multimedia displays, homework, quizzes, tests and other supplements. For purposes of calculating the royalties due plaintiff—and other authors—on courseware, Cengage has adopted a portfolio-wide practice of arbitrarily and improperly ascribing value to the supplemental material packaged with the author's work, or to the digital packaging itself, when the courseware is derivative of the author's work and the author royalty should be paid on the entire, or substantially all, of the courseware package. The effect of this practice is that Cengage reduces the base against which an author's royalty rate is applied for

courseware sales, so as to improperly reduce royalty payments to authors. Cengage's widespread practice of arbitrarily apportioning value on Cengage's courseware has significantly eroded royalties paid to plaintiff, and constitutes a breach of the publishing agreements.

6. In addition to the Class Claims, Plaintiff asserts individual breach of contract claims against Cengage for frustration of his royalty-on-sale publishing agreements and underpayment of royalties.

7. With respect to the Class Claims, plaintiff seeks relief from the Court as follows: (i) damages for Cengage's common breaches of the publishing agreements and frustration of the agreed upon royalty-on-sale compensation structure; and (ii) injunctive relief prohibiting Cengage from including Class Members in the Cengage Unlimited subscription model without their permission. Individually, plaintiff seeks damages for royalty underpayment and frustration of his royalty-on-sale agreement, and injunctive relief prohibiting Cengage from including his works in Cengage Unlimited without his permission.

## JURISDICTION

8. This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000.00, and there is diversity of citizenship between proposed class members and Defendant.

9. Venue is proper in this District under 28 U.S.C. § 1391(a)(1) and (2). Defendants maintain an office at 75 Greene Street, New York, NY 10012, and conducts a substantial amount of business in this District, including contracting with members of the Class, and sale and distribution of plaintiff's works. In the past year, Defendants have sold millions of dollars worth of textbooks, and other types of books, in this District.

## PARTIES

10. Grafton H. Hull, Jr. is a citizen and resident of Wisconsin, and is party to agreements dated April 25, 1990, and April 1, 1995, with Nelson-Hall Inc. and Brooks/Cole, a division of Cengage Learning, Inc., respectively, for the publication of works entitled "Understanding Generalist Practices" and "Generalist Practice with Organizations and Communities." Additionally, Hull is a party to an agreement dated May 22, 1992 with Wadsworth Publishing Company for the publication of the work entitled "Case Studies in Generalist Practice." Cengage Learning is the successor publisher to these agreements.

11. Cengage Learning, Inc., ("Cengage Learning"), is a Delaware Corporation registered to do business in the State of New York with a residence at 75 Greene Street in New York, NY.

12. Cengage Learning Holdings II, Inc., ("Cengage Holdings"), together with its subsidiaries including Cengage Learning, Inc., operates as a publisher and distributor for higher education textbooks, print, and electronic learning aids. Cengage Learning Holdings II, Inc. has a residence in the State of New York at 75 Greene Street in New York, NY.

## DETAILED ALLEGATIONS

A. The Typical Publishing Agreement

13. Cengage Learning and Cengage Holdings, collectively "Cengage," is a publisher, seller, and distributor of textbooks and learning-materials, which emphasizes the provision of academic materials for use in institutions of higher learning.

14. Historically, the Cengage business model has entailed obtaining publishing agreement contracts with academic authors (generally professors), pursuant to which (i) the author agrees to produce an academic textbook for the publisher, and transfers some or all of its copyright rights to the publisher; (ii) the publisher, in turn, agrees to publish, market, sell,

4

and distribute the work; and (iii) the author earns a royalty from each sale of his or her work (each such agreement a "Publishing Agreement").

15. The agreements between plaintiff Grafton Hull and Cengage follow the foregoing, typical structure.

16. For many years, this has been the typical structure of Publishing Agreements in higher education—both between Cengage and its authors and other publishers and their authors. Over the years, Cengage has become the successor-in-interest to thousands of similar Publishing Agreements, as it has acquired or merged with other publishers.

17. The fundamental bargain struck in the Publishing Agreements is that the publisher supports the publication, distribution, and *sale* of the author's work, and pays a percentage royalty to the author based upon the net revenue obtained from each copy sold. Based upon the agreed upon compensation terms in the Publishing Agreements, plaintiff and other authors have relied upon, and expected, Cengage to support the sale of their works in a commercially reasonable fashion.

**B. Cengage's Bankruptcy**

18. Dating back more than a decade, the textbook publishing industry has been adapting to significant technology shocks. Several trends have apparently had an adverse effect on the profitability of publishing.

19. First, the marketplace for used and rented materials has expanded significantly, particularly as the result of online marketplaces and the ease with which material can be located or distributed. Even new sales are impacted by the online marketplace, as students can comparison shop and seek bargains rather than buying locally or through college bookstores.

5

20. Second, students have increasingly become reliant upon e-readers, tablets, and electronic books as an alternative to printed copies. Digital books present challenges to publishers, and tend to erode printed sales and revenues.

21. Third, "open source" alternatives to traditional textbooks are gaining ground, *i.e.*, learning materials prepared by the academic community, which may be circulated digitally at zero marginal cost to students.

22. Finally, students and instructors have increasingly turned to digital versions of author works, rather than traditional printed textbooks and supplements, which are typically offered at a lower price. Cengage's digital learning materials—including its "MindTap" digital supplements—are derived from author works, and may include supplemental or interactive components, such as practice material, quizzes, or multimedia additions.

23. In July 2013 Cengage Limited filed for bankruptcy protection, with $5.8 billion in debt and an inability to meet its ongoing obligations. The company emerged from bankruptcy in April 2014, relieved of $4 billion in debt, and securing an additional $1.75 billion in exit funding.

24. At the time it emerged from bankruptcy, Cengage's CEO, Michael Hansen was interviewed by the noted publication, "Inside Higher Ed." In that interview, Hansen stated that there was a "growing awareness in all positions of [Cengage] that the model that used to make Cengage successful … is no longer in place."

25. Hansen further stated that the reorganized Cengage "[was] much closer to a software company than a traditional publisher," noting that product development would thereafter be handled by "five different silos," led by "a general manager and a chief technology officer."

26. When Cengage emerged from bankruptcy, its operating plan projected that Cengage would double its share of active digital users to 4.8 million by the 2018 fiscal year, and that, by 2018, "40 percent of the company's adjusted earnings before interest, taxes, depreciation and amortization will come from digital offerings such as MindTap, a cloud-based learning platform that combines readings and multimedia with assessments and analytics."

27. Cengage and its CEO, Hansen, embraced the need to overhaul the Cengage business model, stating that the "turn" for Cengage would come when "we at Cengage have developed compelling alternatives to the textbook experience." "The real inflection point in this market," Hansen stated, would come "when a student *buys a digital solution* that can become a *digital substitute* for the textbook." Hansen further stated that he "want[ed] to push very aggressively on converting those that are reluctant – and, I understand, sometimes *rightly reluctant*" to adopt such "digital substitutes" for textbook sales.

28. Thus, upon exiting bankruptcy, the Cengage operating plan set forth a deliberate path for Cengage to reorient its business model towards a "digital solution," and away from textbook sales. Cengage's CEO knew and understood that he would need to "push very aggressively" to convert those who might be "rightly reluctant" to adopt that model. Plaintiff is among those rightly reluctant to adopt the model, because the model undermines his agreed upon compensation structure and because it will have lasting adverse impact on the incentives for developing higher learning study materials.

C. **The Cengage Unlimited Model**

29. The "digital substitute" anticipated by Hansen in 2014 turns out to be Cengage Unlimited. Cengage Unlimited is an "all access" electronic subscription model for access to Cengage's catalog of thousands of titles: similar to Netflix for textbooks. Instead of

buying books on a per-course basis, students may pay a one-price subscription fee per semester, per year, or per two years, for access to Cengage's electronic catalog and related offerings.

30. Under the "Cengage Unlimited" model, Cengage allocates some or all of its subscription fees into several different "Revenue Pools," based upon the types of material included with Cengage Unlimited access (*i.e.*, courseware supplements, e-books, or print rental).

31. Cengage has not disclosed whether it deducts any amounts from its subscription revenues prior to allocating the revenues to Revenue Pools, and has not disclosed the method by which it allocates its subscription fees among the Revenue Pools.

32. Cengage assigns each of its accessible author works into one of the Revenue Pools. Authors are paid royalties from the Revenue Pool, based upon a function of (i) the author's contractually-agreed royalty rate to be applied to **sales** of the book, and (ii) the "weighted average of the **number of uses** x by net price as a percentage of the total for each title and product type." That is Cengage's description of the royalty calculation, which it provided to authors purportedly to clarify the royalty calculation (*see* the chart below):



33. Cengage has expressly declined to provide specific examples of how the Cengage Unlimited royalty calculations work. What is clear, however, is that the royalty model employed by Cengage Unlimited depends in substantial part on *relative use* of a title as compared to other titles in the same revenue pool.

34. The Cengage Unlimited royalty model is a significant departure from the royalty model agreed to in the typical publishing contract, which provides for royalties to be paid on the *sale* of a title—whether the student uses the book once, one hundred times, or whether it becomes a support for a lopsided dormitory bed.

35. With a fixed pool of subscription revenue to be allocated amongst all of the titles a subscriber accesses during a given period, and with royalties being paid based upon the *relative use* of one title versus another title (rather than on the volume of sales for a specific title), the Cengage Unlimited model has a significant adverse impact on the manner in which revenue is generated and royalties are paid out to individual authors.

36. Cengage has conducted a series of conference calls and webinars for its authors, in an effort—to use the parlance of CEO Hansen—to "convert" authors who are "rightly reluctant" to adopt the Cengage Unlimited model. During those calls and presentations, Cengage stated that (i) authors are not permitted to opt-out of the Cengage Unlimited model, and (ii) Cengage will be curtailing its support for individual-title sales.

37. Cengage has refused author efforts to renegotiate Publishing Agreements so that the royalty payment provisions conform to the Cengage Unlimited model.

38. Plaintiff is rightly reluctant to adopt the Cengage Unlimited model for various reasons, including (i) it fundamentally undermines the compensation structure for which he contracted, *i.e.*, a royalty payment based upon the sale of his work; (ii) it tends to transform the incentives in textbook development and publishing to the long-term detriment of academic

learning, pitting authors against each other in an effort to maximize "clicks" on digital learning materials, and emphasizing digital learning aids over printed textbooks; (iii) without transparency as to how royalties are calculated, there is no way to know the extent to which this model disadvantages plaintiff and Cengage's other authors; (iv) Cengage's systematic dismantling of support for individual-title sales, in favor of marketing the Cengage Unlimited all-access pass, causes irreparable injury, eroding the goodwill associated with Cengage titles.

39. With respect to the dismantling of its support for individual-title sales, Cengage has informed Plaintiff that as part of the reorientation towards Cengage Unlimited, it is reducing support for the sale of individual titles, and will be curtailing the revision schedule on various works. By way of example, in 2018, Cengage devised a marketing campaign that deliberately undermined the sale of Cengage titles, directing potential customers ***not to purchase books***, but rather to purchase Cengage Unlimited subscriptions. Cengage affixed the following stickers to the shrinkwrapping of books delivered to college bookstores:



40. Thus, rather than taking reasonable steps to sell author works, as was the objective of the agreed upon royalty-on-sale Publishing Agreements and the longstanding

business model that Cengage has now repudiated, the Cengage Unlimited business model prioritizes increasing overall market share and recurring revenue for Cengage, by cross-marketing its catalog to colleges and universities without regard to the merit of any particular work. The Cengage Unlimited model undermines the agreed upon marketing, sale, and compensation structure found in the Publishing Agreements, *i.e.*, royalties to be paid on the sale of particular works, in favor of increasing subscription revenue to Cengage Unlimited.

### D. Courseware Allegations

41. Plaintiff's publishing agreement, and Publishing Agreements generally, authorize Cengage to prepare electronic versions of the work and "supplements" using author work subject to the Publishing Agreements. Just as with print versions of the work, the Publishing Agreements provide for the payment of a royalty to plaintiff based on the ***sale*** of electronic versions and supplements.

42. Cengage, as part of its operational overhaul, began emphasizing the development of digital "MindTap" courseware supplements. Typically, these courseware supplements begin with and are based upon an author's work, and package the author's work in a digital format, with homework, quizzes, tests, and multimedia materials that are intended to enhance the experience of learning the content of the author's work. Each of the MindTap courseware applications derives from the author work.

43. Cengage regularly packages plaintiff's works—Understanding Generalist Practices, and Generalist Practice with Organizations and Communities—with MindTap courseware supplements.

44. As a matter of common practice, Cengage has arbitrarily reduced royalty payments to authors, and to plaintiff specifically, on courseware sales, by improperly allocating excess value to the digital framework, packaging, and supplements, as compared to plaintiff's

11

work that is the foundation of the specific MindTap product associated with a title. By arbitrarily apportioning a large share of the value associated with MindTap or other courseware to the framework and packaging supplied by Cengage—as compared to plaintiff's work that is the foundation for the MindTap supplement—Cengage systematically underpays plaintiff the royalties due on MindTap and other courseware sales. That is because, when calculating royalties, Cengage only applies the royalty percentage from the Publishing Agreements to that portion of the sales revenues that it unilaterally and improperly deems to be associated with the work produced subject to the Publishing Agreement. Cengage does not pay any royalty on the balance of the MindTap sales revenue, which it unilaterally deems to be associated with its own contribution to the digital packaging and supplement.

45. Cengage's practice of overvaluing the Cengage-created component of a MindTap or other courseware offering, while devaluing author contributions, constitutes a breach of plaintiff's publishing agreements and authors' typical Publishing Agreements, which provide for the royalties to be paid based on the sale of Plaintiffs' works, in all formats. To the extent that quizzes, tests, multimedia, or other such "add ons" to Plaintiffs' work are included in the MindTap or other courseware offering, such assemblages and add-ons are simply derivative to Plaintiffs' works, supplied pursuant to the Purchasing Agreements.

46. Digital "courseware" constitutes one of the Revenue Pools for the Cengage Unlimited business model. Cengage has not disclosed how it allocates its Cengage Unlimited subscription revenue among its revenue pools, but upon information and belief, Cengage over-allocates revenues to the courseware Revenue Pool, so that it can minimize its royalty burden, by resorting to arbitrary and improper practices regarding courseware royalty payments. More specifically, by over-allocating subscription fees to the courseware Revenue Pool, and then under-allocating the value associated with courseware to plaintiff and other

authors, as compared to value allocated to Cengage's supplements, Cengage improperly reduces its compensation to plaintiff.

### E. Class Allegations

47. Plaintiff has brought this action as a nationwide class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), on behalf of himself and all other authors, and/or respective successors in interest, who (i) have entered into Publishing Agreements, as defined, with Cengage (or any of its predecessors or successors in interest), and therefore contracted for the payment of royalties based on the *sale* of their work (the "Class," and each member a "Class Member"). Excluded from the Class are Defendants, and any person, firm, trust, corporation, or other entity related to or affiliated with Defendants, including, without limitation, persons who are officers, director, employees, associate or partners of Cengage.

48. This action satisfies the requirements of FRCP Rule 23 and is properly maintained as a class action.

49. Courts have previously upheld complaints brought by authors against publishers on a class basis, based upon common terms in various publishing agreements and common practices by the publisher, to the extent that the plaintiffs seek to determine common issues of law and fact affecting the class.

50. The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Upon information and belief, hundreds of persons have entered into Publishing Agreements with Cengage or its predecessors in interest, and have bargained primarily for the publisher to provide support for the publication, *sale*, and distribution of their works.

51. There are questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class member. The common questions of law and fact include, without limitation:

    a. Whether the Cengage Unlimited model frustrates Class Members' right to earn royalties on the sale of his or her works pursuant to a Publishing Agreement;

    b. Whether, by dismantling its support for the sale of individual titles, and reorienting its efforts towards the Cengage Unlimited model, Cengage has breached the covenant of good faith and fair dealing implicit to each of the Publishing Agreements;

    c. Whether Cengage should be obligated, as a matter of law and equity, to disclose clearly their royalty calculation methodology, and the royalty calculations that it employs in the Cengage Unlimited model;

    d. Whether the methodology used by Cengage to define and fund Revenue Pools is consistent with the Publishing Agreements;

    e. Whether Cengage's methodology for allocating Revenue Pool funds among different works, based upon various factors including the *relative use* of those titles, comports with the Publishing Agreements;

    f. Whether Cengage should be obligated, as a matter of law or equity, to permit Class Members to 'opt-out' of the Cengage Unlimited model;

    g. Whether Cengage's methodology for determining the relative value apportionable to Class Members' works, for purposes of calculating royalties on MindTap and other courseware offerings, comports with the Publishing Agreements;

    h. Whether Class Members have sustained damages or irreparable injury as a result of Cengage's implementation of the Cengage Unlimited model, and if so, the proper measure to be applied in determining damages and restitution;

52. Plaintiff's claims are typical of the claims of the Class and Plaintiff has no interests adverse or antagonistic to the interests of other members of the Class.

53. Plaintiff will fairly and adequately protect the interests of the Class and has retained experienced counsel, competent in the prosecution of class action litigation.

54. A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein. Plaintiff does not anticipate that unusual difficulties are likely to be encountered in the management of this class action.

55. A class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender, or the inconsistency in results that might occur if the claims were litigated independently.

56. In particular, because the Cengage Unlimited model makes Class Members' royalties dependent upon the relative use of each Class Members' work—a business decision unilaterally adopted by Cengage that is not consistent with the Publishing Agreements—uniformity in treatment of the claims is crucial to a fair, equitable, and just result.

57. By implementing Cengage Unlimited, Cengage is acting on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief with respect to the Class as a whole.

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT

58. By implementing the Cengage Unlimited model, Cengage has breached its Publishing Agreements with Class Members in at least three ways: (i) by frustrating Class Members' ability to earn royalties for the sale of their works, which was the fundamental bargain struck pursuant to the Publishing Agreements; (ii) by breaching the covenant of good faith and fair dealing implicit to the Publishing Agreements, in implementing the Cengage Unlimited model that undermines the royalty-on-sale bargain struck by the Publishing Agreement; and (iii)

by improperly and unfairly determining the royalty to be paid to Class Members under the Cengage Unlimited model as a function of *relative use* rather than *sale* of works.

59. Cengage has breached its Publishing Agreements with Class Members by systematically undervaluing Class Member contributions to courseware, MindTap, and other similar digital offerings, thereby underpaying royalties to Class Members on those courseware offerings.

60. Cengage has breached the implied covenant of good faith and fair dealing implicit to the Publishing Agreements by refusing to provide reasonable disclosure of sales and royalty data as necessary to answer questions concerning the validity of its royalty calculations, and its confusing royalty statements.

61. Cengage has individually breached its agreement with plaintiff in the foregoing ways.

## SECOND CAUSE OF ACTION:
## DECLARATORY AND INJUNCTIVE RELIEF

62. Class Members seek declaratory and injunctive relief (i) declaring that the Cengage Unlimited model causes irreparable injury to Class Members as a result of, *inter alia*, Cengage's curtailment of support for the marketing and sale of works and the corresponding injury to the goodwill associated with author works; (ii) enjoining Cengage from including Class Members' works in the Cengage Unlimited plan without Class Members opting-in to the new distribution and compensation model being advanced by Cengage; and (iii) declaring that, to the extent that Cengage has materially breached the Purchasing Agreements by including Class Members' works in Cengage Unlimited without their permission, Class Members are entitled to damages, to terminate the Publishing Agreements, and to obtain a reversion of all rights granted to Cengage pursuant to the Purchasing Agreements.

WHEREFORE, Plaintiffs prays for judgment accordingly:

A. Declaring that this action is properly maintainable as a class action, and certifying Plaintiffs as Class representatives;

B. Declaring that the Cengage Unlimited model has and will cause irreparable injury to Class Members, and restraining Defendants, their employees, agents, and successors, from *inter alia*, including or maintaining Class Members' works in Cengage Unlimited without their express "opt-in" permission;

C. Declaring that, to the extent that Cengage has materially breached the Purchasing Agreements by including Class Members' works in Cengage Unlimited without their permission, Class Members are entitled to terminate the Publishing Agreements and to a reversion of all rights granted to Cengage pursuant to the Publishing Agreements;

D. Awarding damages in an amount to be proved at trial, but exceeding $5 million to Class Members and $75,000 to Plaintiffs, for Defendants' breach of the Publishing Agreements;

E. Awarding pre- and post-judgment interest;

F. Awarding Plaintiffs and the Class the costs of this action, including reasonable attorneys' fees and expenses; and

G. Awarding Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

New York, NY
Dated: August 15, 2019

                                SLARSKEY LLC

                                By:_____
                                David Slarskey
                                Evan Fried
                                800 Third Avenue, 18th Floor
                                New York, NY 10022
                                (212) 658-0661
                                *Counsel for Plaintiffs*